were very carefully considered by the supreme court in the case of U. S. v. Workman [supra], and it was there held that that body could not confer upon the governor any power over the domain of the nation, and that its own power in the alienation of public property of that character was limited, by the colonization laws of Mexico, to the approval or disapproval of grants made by the governor under those laws.

The counsel of the defendants feeling the force of the adjudication in that case, contends that the title to the church lands was never vested in the bishop, or in the Catholic Church, but remained in the Mexican nation at the time of the conquest and cession of the country; and that the patent to the bishop is not therefore evidence of any title anterior to its date, and can only be treated as a conveyance of the interest which the United States then possessed; and that the defendants' confirmation and approved survey, taking effect by relation as of the date of their petition to the land commission, carries an earlier title.

The obvious answer to this position is, that the adjudication of the supreme court that the departmental assembly had no authority to authorize the governor to sell any portion of the public domain, nullifies the effect of the confirmation. That confirmation does not of itself translate the title of the United States. As declaring the validity of an existing title it might operate to protect the estate of the confirmee. But the validity of that title having been assailed by the supreme court and overthrown, the confirmation can afford no aid to the defendants in their contest with the title of the plaintiff.

The patent is also something more than a mere conveyance of the government; it is evidence having the force and operation of a record that the title claimed was valid, or at least entitled to recognition and confirmation, at the time the sovereignty of Mexico over the country was superseded by the sovereign authority of the United States. It is evidence to that extent which is not open to dispute in an action of ejectment, except where the assailant comes into court possessed of a similar record or one of equal dignity. The defendants stand in no such position; they have no such record; their confirmation and survey being of a claim, belonging to a class adjudged invalid by the highest tribunal of the nation, furnishes no vantage ground to them in an attack upon an established and patented title, beyond that held by mere trespassers.

The plaintiff is therefore entitled to the premises. It is admitted that the defendants were in possession at the commencement of the action, but there is no evidence of their possession at any previous period. There is therefore no foundation laid for the recovery of any other than nominal damages, and none will therefore be awarded.

The plaintiff must have judgment for the

17 FED. CAS.—46

possession of the premises with one dollar damages, and it is so ordered.

[Upon a writ of error, the judgment of this court was affirmed. 98 U. S. 425.]

———

MORA (WILLIAMS v.). See Case No. 17.730.

MORAGA (UNITED STATES v.). See Case No. 15,806.

———

## Case No. 9,785.

### MORA v. BAUDIN.

[2 Pet. Adm. 415.] [1]

District Court, D. Pennsylvania. 1788.

SEAMEN — VOYAGE CHANGED — DISCHARGE AND WAGES DEMANDED—FOREIGN SEAMEN—RIGHTS DETERMINED BY WHAT LAW.

1. A French seaman claimed his wages from a ship which had changed her voyage from that for which he originally entered. The court decreed his wages.

[Distinguished in Thomson v. The Nanny, Case No. 13.984. Cited in The Saratoga, Id. 12,355; The Maria. Id. 9,074; Nevitt v. Clarke. Id. 10,138; Davis v. Leslie, Id. 3,-639; Bucker v. Klorkgeter, Id. 2,083; The Becherdass Ambaidass, Id. 1,203.]

[See The Bee, Case No. 1,219.]

2. The case of a French seaman to be determined by the marine law of France.

3. What deviation from the original voyage will justify mariners in demanding their discharge.

[Cited in The Becherdass Ambaidass, Case No. 1.203.]

The libel in this case states, that Charles Moran the libellant entered as a mariner on board the ship L'Heureux at Nantz, in France, on the twenty-third day of October, 1786, under an engagement for a voyage from the said port of Nantz to New Orleans in the Mississippi, from thence to go to Martinique, and from thence to return to France. That Alexander Baudin the captain, had totally altered this voyage by repeated deviations, whereby the contract was broken, and thereupon the libellant prays a discharge and the amount of wages due. The circumstances of this case appear from the testimony exhibited, to be as follows: That this vessel sailed from Nantz the twenty-third of October, 1786; that the mariners understood and were informed that this voyage was to be to New Orleans first, thence to the West Indies and thence back to Nantz or to some port of France, and that it would continue from 10 to 15 or 16 months, and under this expectation the mariners were registered at the proper office at Nantz, according to the manner of registering seamen in France. That instead of pursuing this voyage, as designated to them, they were taken three times to New Orleans, twice to Martinico, thence to Aux Cayes, once to the Havannah and were now brought to Philadelphia. That in the course of these several voyages, the libellant and

———

[1] [Reported by Richard Peters, Jr., Esq.]

others of the crew made frequent complaints of the deviation from and prolongation of the originally intended voyage, and had applied to the intendants of some of the ports they were at, demanding to be discharged, or taken back to France, but were detained in the service of the ship by repeated assurances of the captain, that from the then next intended port they should be taken back to France. That in particular, when they were at Martinico the second time, the whole crew complained and demanded their discharge, whereupon the captain threw the boatswain and another sailor into prison, and that the boatswain wrote to the commanding officer of a frigate there, who sent for him on board, obliged the captain to pay him his wages and discharged him.

To this libel and testimony, the respondent hath urged in reply: That no contract or articles between the captain and crew at Nantz hath been exhibited or proved; that the libel itself is deficient in form, and that, let the deviations from the original voyage be what they may, the libellant hath for his part justified the whole by signing a process verbal on board the ship on the 30th of April last, certifying that the ship L'Heureux had suffered damage by storm, and consenting to be put into the port of Philadelphia in distress, which verbal process, so signed, was exhibited in court. As there is no ordinance of the United States, or act of the legislature of Pennsylvania touching the present point, the claim of the libellant, who is a French subject, and was shipped in France, will most properly be determined by the marine ordinances of the country to which he belongs, and under which he engaged in the service of this vessel. These ordinances strictly prohibit any captain or master of a vessel from receiving on board his ship any mariner, as such, who is not entered on his role d'equipage, made up in the commissary's office, or bureau de classes, of the port where the vessel shall be. See Ord. de Marine, vol. 1, pp. 422, 715. Now, as it has not been controverted but that the libellant has served on board this ship ever since she sailed from Nantz, it is in vain to call upon him for proof of the contract made at Nantz, since the role d'equipage, or a transcript of it, is in the captain's hands, and never in the mariner's. Had no such engagement taken place as mentioned in the libel, or should the libellant demand larger wages than had been agreed upon, the captain would have shewn the role d'equipage in proof against him. As he has not done this, although in his power, it follows that the allegation of the libellant must be admitted as true. Indeed it is in positive testimony that the libellant entered on board at Nantz, and was to receive 50 livres per month, wages; which is sufficient proof of a contract.

The next point is to consider the repeated deviations from the original voyage, and how far this should operate in releasing the mariner from his contract. To lay it down as a general rule that the least deviation from a designated voyage, should invalidate the articles and discharge the mariners in a foreign port, would perhaps be construing shipping articles too strictly, and certainly very injurious to commerce. Shipping articles are not to be construed by the same rules with a policy of insurance, their object and ground of reason being quite different. Yet gross and unnecessary deviation shall free a mariner from his contract; but there is no occasion to fix a general rule now—this cause is to be determined by the positive laws of France, and there is an ordinance express to the purpose. Ord. de Marine, vol. 1, p. 548, art. 4. See 2 Pet. Adm. Append. p. 14. "If at any time after the arrival and discharge of the vessel at the port of her destination, the captain or master, instead of returning, shall freight or load his ship to go elsewhere, the mariner may leave her if he chuses, unless it has been otherwise determined by his special engagement." And this rule is further enforced by Valin's commentary on the article. There appears to me a strong presumption that the boatswain who was paid off and discharged at Martinico by order of the commander of a frigate there, claimed the benefit of this ordinance. It is said, indeed, that his mother was dead, and he had business in France: but this, I think, would hardly be admitted as a sufficient reason to discharge a mariner in the midst of a voyage. Such as it was, it is plain that Captain Baudin did not deem it sufficient, for he put the man in prison for demanding his wages and claiming his discharge.

The objections to the libel in point of form are not sufficient to exclude this cause from the notice of the court. It is indeed, not so precise as might be wished, but the substance of the complaint is alleged, viz. an engagement for a certain voyage, frequent deviations from the voyage proposed, and a citation prayed for, to shew cause why the wages accrued should not be paid, and the libellant discharged. The verbal process signed by the libellant on board the ship is the next circumstance relied on by the respondent; but this, I think, cannot have the operation expected. If the ship was really in distress as declared, there is no doubt but any mariner would sign his consent to put into a strange port, to avoid impending danger and refit the damaged rigging. But this deviation, occasioned, as it should seem, by necessity, cannot be deemed a justification of former deviations, where no such necessity appears, or is even pretended.

I am clearly of opinion, that if this cause was tried before a French court of justice, the libellant could not be refused the benefit of the marine ordinances of France, so expressly in favour of his claim. Therefore, I adjudge and decree, that Charles Moran have and receive from the respondent in this cause, his wages at the rate of 50 livres per month,

from the 23d of October, 1786, to the date of the present libel, and that the respondent pay the costs of suit.

## Case No. 9,786.

### MORAN et al. v. SCHNUGG et al.

[7 Ben. 399.] [1]

District Court, S. D. New York. Aug., 1874.

BANKRUPTCY — PRIORITIES — MORTGAGE — ME-
CHANIC'S LIEN.

A mortgage recorded before the filing of a mechanic's lien is entitled to priority. When the bankruptcy court takes possession of property on which there are mechanics' liens, and sells it free and clear of the liens, it forecloses the liens, and the lien holders are not bound to renew or continue their liens, to preserve their rights against the proceeds of the property.

This was an action [against John Schnugg and others] brought by [James H. Moran and others] assignees in bankruptcy [of Leopold Bohm] to set aside certain mortgages and mechanics' liens upon the bankrupt's property, which the court had sold free and clear of both mortgages and liens. On the evidence the court held that the mortgages were valid. The question remained as to the mechanics' liens and their priority.

Abbott Bros., for plaintiffs.

Boardman & Boardman, W. B. Putney, L. B. Bunnell, and Otto Meyer, for defendants.

BLATCHFORD, District Judge. As between the mortgages and the mechanics' liens, the former are not only valid, but are prior in time. The former were recorded before any of the latter were filed. This gives priority to the former.

The mortgages must, therefore, be decreed to have validity and precedence, both as regards the mechanics' liens and the assignees in bankruptcy, the Schnugg mortgage for the full $10.000, and the Baerlein mortgage for $6,800.

As between the mechanics' liens and the assignees in bankruptcy, I think the liens are not open to any of the objections urged against them by the plaintiffs.

The bankruptcy court, within the year from the filing of the liens, took possession of the property, and sold it free and clear of the mechanics' liens, and put the proceeds of sale into the hands of its officers, in place of the estate so disposed of. It did this by virtue of the provisions of the 20th section of the act [of 1867 (14 Stat. 526)]. It thereby foreclosed the liens. It converted into money the property that was subject to the liens, and thereby prevented the lienors from ever taking measures to foreclose the liens. The lienors were not only relieved thereby from any duty to renew or continue their liens within the year, but they had no right to renew or continue a lien against property

which the bankruptcy court had sold free from such lien.

As regards renewing or continuing the lien, so as to make it continue operative against the proceeds of the sale, it is sufficient to say, that at least from the commencement of this suit, which was within the year, the rights of the lienors were fixed, and whatever their rights as lienors were when this suit was brought, such they must be adjudged in this suit to be. As between the plaintiffs and the lienors, the fund must be administered and distributed as of the time when the plaintiffs came into this court and asked this court to administer and distribute it.

## Case No. 9,787.

### MORAN v. STRAUSS et al.

[6 Ben. 249.] [1]

District Court, S. D. New York. Nov., 1872.

MORTGAGE—BY CORPORATION—REAL AND PERSON-
AL PROPERTY—CONSENT OF STOCKHOLDERS.

1. A corporation, incorporated under the general manufacturing law of the state of New York, executed a mortgage on real and personal property, and an assignment of two patents, as security for moneys due to the mortgagees from the company. The consent of two-thirds of the stockholders to the mortgage of the real estate was given. The holder of seventy-five shares, whose signature made up the two-thirds, had bought them at a sale ordered by the board of trustees, the stock having been held by two of the trustees, for the benefit of the stockholders. The purchaser of the shares at this sale, which was on credit, was a trustee. The sale was approved by the board. The assignee in bankruptcy of the company filed a bill to set aside the mortgage and assignment: *Held*, that the mortgage was consented to by two-thirds of the stockholders, and its consideration was advanced in good faith.

2. No consent was necessary to the mortgaging of the personal property, or the assignment of the patents.

3. The mortgage and the assignment could not be set aside, but must be regarded as security for the moneys due from the company to the defendants at the time, and moneys advanced by the defendants on the faith of them.

The plaintiff in this action filed this bill to set aside a mortgage. The bill alleged that, on March 19th, 1869, the Columbian Metal Works filed a petition in voluntary bankruptcy, and were adjudged bankrupt, and the plaintiff [James H. Moran] was appointed assignee; that the bankrupts were a corporation incorporated under the general manufacturing law of the state of New York, and were the owners of real estate in Morrisania, New York, and also of personal property, among which were two patents; that, on August 30th, 1867, they executed to the defendants a mortgage on all the real and personal property, except the patents, and also assigned to them the patents; that both the mortgage and the assignment were void under the laws of New York; that the money purporting to be the consideration

[1] [Reported by Robert D. Benedict. Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.].