BEDOWIN, The, (AMERICAN DREDGING CO. v.) See Case No. 299.

# Case No. 1,219.

## The BEE.

[1 Ware, (332,) 336.] [1]

District Court, D. Maine. May 13, 1836.

ADMIRALTY JURISDICTION — SUITS BETWEEN FOREIGNERS—CONSENT OF CONSUL—SUITS IN REM—LOCUS REI SITAE—SALVAGE — DERELICT—ABANDONMENT—AMOUNT.

1. When a party objects to the jurisdiction, if the objection is founded on a personal privilege of declining the forum, it must be made before entering a general appearance and answering to the merits.

[Cited in Manchester v. Hotchkiss, Case No. 9,004.]

2. A court of admiralty has jurisdiction over controversies of a maritime nature, between foreigners who are transiently within the jurisdiction of the court.

[Cited in The Ada, Case No. 38.]

[See, also, Moran v. Baudin, Id. 9,785; Ellison v. The Bellona, Id. 4,407; The Jerusalem, Id. 7,293; Davis v. Leslie, Id. 3,639; The Havana, Id. 6,226; Thomassen v. Whitwell, Id. 13,928.]

[3. Cited in Ex parte Newman, 14 Wall. (81 U. S.) 169, to the point that in a suit between foreigners, transiently within the jurisdiction of the court, the consent of the representative of the foreign government is merely a material fact to aid the court in the exercise of its discretion on the question whether to assume jurisdiction or not.]

4. But the court is not bound to take jurisdiction of a case in which all the parties are foreigners.

[Cited in The Ada, Case No. 38.]

[See Moran v. Baudin, Id. 9,785; Ellison v. The Bellona, Id. 4,407; The Jerusalem, Id. 7,293; Davis v. Leslie, Id. 3,639; The Havana, Id. 6,226; Thomassen v. Whitwell, Id. 13,928.]

5. Suits in rem are local, and the court within whose jurisdiction the thing is situated is the proper forum, though all the parties in interest are foreigners. There is an exception to the general rule, when the thing has been brought within the jurisdiction of the court by a violation of the sovereign rights of another nation.

6. Property is derelict in the sense of the admiralty, when the owner has abandoned it without the intention of returning and resuming the possession. The owner's right of property

[1] [Reported by Hon. Ashur Ware, District Judge.]

is not lost by the abandonment, but the possession is left vacant.

[Cited in The Hyderabad. 11 Fed. 754; The Ann L. Lockwood, 37 Fed. 237.]

[See Moran v. Baudin, Case No. 9,785; Ellison v. The Bellona, Id. 4,407; Tyson v. Prior, Id. 14,319; The Jerusalem, Id. 7,293; The Emulous, Id. 4,480; Bean v. The Grace Brown, Id. 1,171; Davis v. Leslie, Id. 3,639; The Havana, Id. 6,226; Thomassen v. Whitwell, Id. 13,928.]

7. The finder, who takes possession of the goods with the intention of saving them, gains a right of possession which he may maintain against the true owner, and a lien upon them for salvage.

[Cited in The John Wurts, Case No. 7,434; Cromwell v. The Island City, Id. 3,410; The Mayflower v. The Sabine, 101 U. S. 386; The Ann L. Lockwood, 37 Fed. 237.]

8. But the owner's exclusive right of possession is not lost by temporarily leaving the goods for the purpose of obtaining aid, and with the intention of returning to save them.

[Cited in The Cleone, 6 Fed. 525; The B. C. Terry, 9 Fed. 922.]

[9. Cited in Patch v. Marshall, Case No. 10,-793, to the point that the master's act in procuring the intervention of a foreign consul to the injury of an American citizen by imprisonment in a foreign jail is cognizable in admiralty.]

[10. Cited in The Choteau, 9 Fed. 211, to the point that the sailors have no right to act against the will of the master.]

[11. Salvage amounting to one-sixth of the value of the property saved was allowed where the service required but four days, and, though laborious, was not attended with any extraordinary peril.]

[Cited in The W. D. B., Case No. 17,306.]

[Libel for salvage against The Bee, Woodworth, master.]

This was a case of salvage. The libellants allege in the libel that on the 13th of November, being informed by the master that the vessel had been thrown down in a gale of wind, and was then lying on the western side of Grand Manan, and was abandoned by him and his crew, they proceeded across the island with the intention of saving her; that they found her and took possession of her, there being then a strong wind from the north-west, blowing directly on shore, that she was in a state of imminent peril, laying on her larboard side, her ballast shifted, the larboard sails and her bulwarks cut away, one anchor down, but the chain not secured and paying out, with only about a fathom and a half remaining in, which they succeeded in securing about the stump of a mast, the masts with her spars having all gone by the board. They let go another anchor, when she dragged and parted her small chain. After much toil and great exposure, they succeeded in righting her; that they then attempted to obtain help to carry her into port, but did not succeed until the 15th, when having procured two small sails, a studding-sail and part of a trysail, they rigged jurymasts, and the wind having changed and the weather become more favorable, they succeeded in getting her into Lubec on the 17th of the month.

The libel was filed at the last December term of the court, when a claim and answer was put in on behalf of the owner by the British consul, stating the situation of the vessel, and denying that she was abandoned by the master and crew, but alleging that they only left her temporarily, the master to make his protest, and the crew to obtain assistance; that they offered the libellants $150 as a remuneration of their services, which was refused, and praying that the vessel may be restored "without salvage, or on paying the libellants such remuneration as the court may adjudge proper and reasonable." At the same time, a claim was filed by the Protection Insurance Company, of Hartford, in Connecticut, alleging the same facts and concluding with the same prayer. And on this day, the owner, Mr. Caltin, filed a claim and answer. The counsel for the claimants then moved that the libel be dismissed, on the ground that the court had no jurisdiction over the cause. The motion was argued by Mr. Hobbs, for the libellants, and Mr. Deblois, for the respondents.

WARE, District Judge. The counsel for the respondents has supported the motion to dismiss the libel, on two grounds; first, because the parties in the cause, both the libellants and respondents, are foreigners, and subjects of the king of Great Britain; secondly, because the vessel is not only a British vessel, but was taken by the salvors, after the disaster had happened, from British waters, and brought within the jurisdiction of the court.

Waiving the question, for the present, whether the court can, under any circumstances, exercise jurisdiction over the cause, I may remark that if the motion had been seasonably made, though it should regularly have been presented in the form of a plea, I should have felt inclined to have yielded to the argument of the counsel, and remitted the parties to their domestic and natural forum. The courts of the United States are not bound to take cognizance of the controversies of strangers having their domicil in a foreign country, as they are of suits which are brought before them by our own citizens; nor are they eager to exercise a voluntary jurisdiction when there is the least disinclination to submit to it. But in this stage of the cause, when it has proceeded thus far without objection, it would be a serious hardship on the libellants to dismiss the libel unconditionally. A proposition was therefore made by the court to dismiss the libel on the parties agreeing that the testimony, which has been taken at considerable expense, should be used without objection in the proper court of their own country. To this proposition the respondents' counsel objects, and insists on an unconditional dismissal of the suit. They insist on their extreme rights, and though I have no desire to

sit and decide controversies between foreigners, justice to the libellants requires, under the circumstances of the case, if the court may rightfully exercise jurisdiction, that the cause should proceed to a final decision in this court. The motion, not being addressed to the discretion of the court, but proceeding on the supposed legal rights of the parties, may be considered in two aspects; first, as being founded on a personal privilege of the party of declining the jurisdiction and having the cause transferred to another forum; and secondly, as standing on an entire want of legal capacity in this court to take cognizance of the cause.

If considered in the first point of view, it comes too late. The libel was filed at the last December term, and a warrant of attachment and monition issued, returnable on the first Tuesday of January. The claimants appeared by their proctors before the return day, and filed interrogatories for the taking of depositions on the 20th of December. On the return day the proctors for the claimants entered into a written agreement with the proctor of the libellant, which is filed in the case, that the hearing should be at Portland, in May. In the mean time the testimony in the case has been taken and returned. A claim and answer has been put in for the foreign owners by his Britannic majesty's consul, and another by the Protection Insurance Company, of Hartford, who are not foreigners but citizens of the United States, praying that the vessel may be delivered to them, "without salvage, or on the payment of such reasonable salvage as the court shall adjudge just and proper." The insurance company not having accepted the abandonment which has been made by the owners, cannot be, it is true, received as claimants. The Henry Ewbank, [Case No. 6,376.] If they were legally parties, it would be an answer to one of the objections to the jurisdiction. But the foreign claimants, as far as acts can go, have waived any personal privilege, if they had any, of declining the jurisdiction. This objection, to be available, should have been taken before a general appearance, and an answer to the merits.

The next question which presents itself, and which has been argued at the bar, is whether the court is wholly incompetent to exercise jurisdiction over the cause, so that its decree on the merits may, according to the established principles of the jus gentium, be held by a court having jurisdiction over the parties, as a mere nullity. It may, I think, be assumed, as a point settled both on principle and authority, that the court is not rendered incompetent on the mere ground of the alienage of the parties on the record. Story, Confl. Laws; 2 Browne, Civ. & Adm. Law, 119; Abb. Shipp. 447. It is believed that in most civilized nations, foreigners transiently among them are allowed to apply to the tribunals of the country to obtain a decision of controversies which may arise between them.

In Rome a particular magistrate was appointed to take jurisdiction of such causes, called the Praetor Peregrinus. Just. Dig. 1, 2, § 28; Poth. Pandect. 1, 2, 20. The courts of this country are not bound to take jurisdiction of controversies between foreigners having no domicil in this country, as they are when parties are citizens or resident among us, and are thus entitled to claim of right the benefit of our laws. It is a question of discretion to the court, whether it will take cognizance of the case, or not, and it cannot be charged with a denial of justice if it remits the parties, with their rights entire, to their domestic forum. Gardner v. Thomas, 14 Johns. 134; Glen v. Hodges, 9 Johns. 67. The question is, therefore, not one affecting the competency of the court, but it turns upon the expediency of taking jurisdiction in the particular case. Courts of admiralty have always been in the habit of entertaining suits between foreigners in cases of salvage, on bottomry bonds, and for seamen's wages, when a refusal to interpose might occasion a failure of justice. In salvage cases this jurisdiction has been less doubted than in others, because salvage is a question arising under the jus gentium, and does not ordinarily depend on the municipal laws of particular countries. The Two Friends, 1 C. Rob. Adm. 271; The Madonna D'Idra, 1 Dod. 37; The Wilhelm Frederick, 1 Hagg. Adm. 138; The Maria Theresa, 1 Dod. 303; The Forsoket, [Case No. 17,682;] The Jerusalem, [Id. 7,293;] The St. Oloff, [Id. 17,357;] 2 Pet. Adm. 415, [Moran v. Baudin, Case No. 9,785;] Bee, Adm. 106, 112, [Ellison v. The Bellona, Cases Nos. 4,406, 4,407;] The Blaireau, 2 Cranch, [6 U. S.] 240. Indeed, the court of admiralty, according to Cleirac, was, in its original constitution in all the maritime nations of western Europe, the appropriate tribunal to take cognizance of suits when the parties were foreigners. Jurisdiction de la Marine, art. 1, notes 1, 2; Id. art. 2. If the jurisdiction of the court is not ousted by the national character of the parties, then, the property being within the jurisdiction, this, upon common principles, is the proper court to take cognizance of the cause. In proceedings in rem, the forum rei sitae is the natural and proper forum, for it is the only one which can make its jurisdiction effectual by operating directly on the thing. Story, Confl. Laws, 462; The Two Friends, 1 C. Rob. Adm. 277; The Invincible, [Case No. 7,054;] The Jerusalem, [Id. 7,293.] A court sitting in another jurisdiction can only reach the thing through the person of the owner. There may be an exception to the universality of this rule, when the thing is seized within the territorial limits of another sovereignty in violation of its sovereign rights, and brought within the jurisdiction of the court. The Apollon, 9 Wheat. [22 U. S.] 362. But when the thing is found within the jurisdiction of the court, the right to adjudicate upon it follows ordinarily as a matter of course, and it belongs to the party who denies the jurisdic-

tion to bring his case within some exception to the general rule. In the present case it appears by the statement of the libel, which in this stage of the case must be taken to be true, that the libellants found the vessel abandoned, at least temporarily, lying in British waters in a state of extreme peril. They took possession of her, as well they might, and carried her to a place of safety. In this there was no violation of the territorial rights of Great Britain. The salvors had a right, and it was their duty, to carry her to a place of safety, and it does not at present appear that this was not the only port of safety which she could reach in her exposed and destitute condition. My opinion is, that the court has jurisdiction, and the motion must be overruled.

On a subsequent day, the testimony having all come in, the case was again argued on the merits. The depositions were very voluminous, but the material parts are stated in the opinion of the court.

WARE, District Judge. The question of jurisdiction having been settled, the case is now to be disposed of on its merits. Whatever difficulty there may be in reconciling parts of the testimony, there are some facts which are either admitted, or are proved by evidence of such a character that they do not admit of a reasonable doubt. The Bee sailed from Boston on the 8th of November, on a voyage to Windsor, in Nova Scotia; on the 11th, she met a heavy gale from the south-east, was thrown down on her beam ends, and lost both her masts, besides suffering some other injuries. The wind then changed, and blew strong from the northwest, and she drifted before the gale into Bradford's cove, on the north side of Grand Manan, where she came to anchor on the morning of the 12th, and lay twenty-four hours. The captain and all hands, Friday morning, the 13th, at 8 o'clock, left her riding with one anchor down, and went ashore to get assistance and refreshments. The wind was then blowing strong from the north, and directly on shore, where the Bee lay exposed to its full force. The master and crew went into the wood, for there was no settlement at the cove, and soon fell in with a party of men, among whom was one Robison, whose house was about two miles from the cove, where they went with the party for refreshments. They related the disaster they had met with, and stated where the vessel lay, and the condition in which they had left her. The libellants, after hearing the story of the master and crew, left the house and went to the cove, and taking the boat which had been left on the shore, went on board and took possession of the vessel. Some time after, the master and crew, having stopped at the house as they say about an hour, returned to the cove and found the libellants in possession of the ves-

sel. They arrived there about one o'clock, having been absent, according to their statement, five hours. Thus far the facts are not controverted, and here the discrepancy in the testimony commences.

It is contended by the counsel for the claimants that the libellants took possession of the vessel wrongfully, and excluded the master and crew by violence, and therefore, that having originally gained the possession by a trespass and continued it by force, although they may by their exertions have saved the wreck, they can make no claim to a reward for acts which were commenced and continued in wrong. If the evidence fully sustained the position of the claimant's counsel, I should readily agree to the conclusion.

When a vessel is found at sea, deserted, and has been abandoned by the master and crew without the intention of returning and resuming the possession, she is, in the sense of the law, derelict, and the finder who takes the possession with the intention of saving her, gains a right of possession, which he can maintain against the true owner. The owner does not, indeed, renounce his right of property. This is not presumed to be his intention, nor does the finder acquire any such right. But the owner does abandon temporarily his right of possession, which is transferred to the finder, who becomes bound to preserve the property with good faith, and bring it to a place of safety for the owner's use; and he acquires a right to be paid for his services a reasonable and proper compensation, out of the property itself. He is not bound to part with the possession until this is paid, or it is taken into the custody of the law, preparatory to the amount of salvage being legally ascertained. Should the salvors meet with the owner after an abandonment, and he should tender his assistance in saving and securing the property, surely this ought not, without good reasons, to be refused, as this would be no bar to the right of salvage, and should it be unreasonably rejected it might affect the judgment of a court materially, as to the amount proper to be allowed. Still, as I understand the law, the right of possession is in the salvor. But when the owner, or the master and crew who represent him, leave a vessel temporarily, without any intention of a final abandonment, but with the intent to return and resume the possession, she is not considered as a legal derelict, nor is the right of possession lost by such temporary absence for the purpose of obtaining assistance, although no individual may be remaining on board for the purpose of retaining the possession. Property is not, in the sense of the law, derelict and the possession left vacant for the finder, until the spes recuperandi is gone, and the animus revertendi is finally given up. The Aquila, 1 C. Rob. Adm. 41. But when a man finds property thus temporarily left to the mercy of the elements, whether from necessity or any other cause, though

not finally abandoned and legally derelict, and he takes possession of it with the bona fide intention of saving it for the owner, he will not be treated as a trespasser. On the contrary, if by his exertions he contributes materially to the preservation of the property, he will entitle himself to a remuneration according to the merits of his service as a salvor.

Applying these principles to the evidence in this case, it is impossible for me to say that this was a case of legal derelict. The master had indeed, with his whole crew, left the vessel, and though there is evidence of some declarations made by him, which, if unexplained, might have led the libellants to suppose that he had abandoned her, the whole evidence taken together conclusively proves that it was his intention to return. But though the intention to return is admitted as the fair result of the whole testimony, it is also true that the whole evidence taken together does not present the conduct of the master in so favorable a light as could be wished. He left the vessel, and took with him the whole crew, without any apparent and overruling necessity, in a situation of extreme peril; he does not appear to have taken all the precautions which were practicable for her safety during his temporary absence; he left her with one anchor only out, when he had another on board, in a heavy gale, driving directly on the rocks of a lee shore. The reason which he gives for this, in his deposition, is, that "if the chain fouled and the vessel swung round, she would be better with one." The reason given by the mate and the seamen is, that the chain was too short, and that one anchor was enough. But when the libellants got on board, the first thing they did was to put out the second anchor, and it does not appear that they found any difficulty in the length of the chain. The master and crew say that the chain of the best anchor, which was down, was made fast. The libellants say that they found it with two or three turns around the windlass, and slipping with every swell of the sea, and with but about a fathom and a half remaining in. The master stated, when at Robison's house, that he left the vessel in a state of extreme peril; that it was doubtful whether she would not be ashore before he got back, and that it would be very difficult, if not impossible to save her. It is further in proof that he stated that "if the vessel went ashore it would be the making of the owners; that one of them was in pretty good circumstances, and that the other was not; that if she came ashore and went to pieces, and they gained the insurance, it would set them up again; that if she was saved it would be the ruin of them." This is sworn to by a disinterested witness, and is in substance confirmed by the unsuspicious testimony of the mate. With these facts in the knowledge of the libellants when they went forward to save the vessel, it is impossible to say that they had not some rea-

son to suspect that the master was not very anxious for her safety; and there is no doubt that they went with the bona fide intention of saving her and entitling themselves to salvage.

But it is said that the libellants having got possession of the vessel, held it, and excluded the master and crew by violence. They returned to the cove some time after the libellants took possession, and, as the master says, hailed them from the shore, but that the distance was such that the answer could not be heard; and having fitted up a camp in the woods, they remained till the next morning, expecting some of the libellants would come on shore during the night, and that then they could regain the possession of the vessel. This not being the case, they hailed again in the morning, and no one coming ashore, the master left the cove and went to Franklands, about twelve miles distant, to note his protest and get assistance; although there were vessels lying at Seal cove, about six miles distant, which might equally well have been obtained, if his principal object had been to obtain the aid of one to tow the schooner. He was absent two days, noted his protest in which he says nothing of being dispossessed of the vessel, attempted without success to get assistance, and on his return found that his own vessel was on her way to Lubec. The mate and crew remained at the cove Saturday and Sunday, and there were several other persons there during that time. The libellants also came ashore two or three times, delivered to the mate the captain's watch, which was left on board, and brought ashore provisions for the men. The mate demanded the boat, which was refused, but the libellants offered to take him on board and set him ashore again. There was no violence offered on one side or the other. The libellants appear to have acted under an impression that, having taken possession of the vessel, when she was left without a keeper, they had a right to hold the possession and entitle themselves, by saving the property, to salvage. They may have supposed that the master was not very anxious for the safety of the vessel. And although there is an unusual asperity in the language of the claimants' witnesses, charging the libellants, among other things, with going on board for the purpose of plundering, there is nothing in the testimony beyond this harsh language which in the slightest degree implicates the honesty of the salvors; and these hard imputations, being unsupported by facts, do not add to the credibility of the witnesses who make them. I may add, for it is on this ground that my judgment in part proceeds, that I am not sure that the vessel and the interests of the underwriters were not quite as safe in the hands of the libellants as they would have been if the vessel had been surrendered to the master.

I decree salvage; but it is not a case which demands a high rate of salvage. The salvors were employed in the service from Friday to

Monday, four days. Though the service was undoubtedly laborious, it was not attended with any extraordinary peril, as the vessel was during no part of the time in so much danger as when they took possession of her. The value of the vessel in the state in which she was saved, was about $2,000. I allow $350 salvage, which is about at the rate of one sixth, and charge the expenses on the residue.