MARTHA'S VINEYARD SCUBA HEADQUARTERS, INC., Plaintiff, Appellant,

v.

The UNIDENTIFIED, WRECKED AND ABANDONED STEAM VESSEL, etc., et al., Defendants, Appellees.

No. 87–1281.

United States Court of Appeals, First Circuit.

Heard Sept. 15, 1987.

Decided Nov. 24, 1987.

Dean E. Cycon, Providence, R.I., for plaintiff, appellant.

Leo G. Kailas with whom Armen R. Vartian was on brief for defendant, appellee Marshallton, Inc.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

When Erasmus mused that "[a] common shipwreck is a source of consolation to all", *Adagia*, IV.iii.9 (1508), he quite likely did not foresee inconcinnate free-for-alls among self-styled salvors. To the exact contrary of what the Dutch scholar had blithesomely predicted, the petitioner-appellant in this case, Martha's Vineyard Scuba Headquarters, Inc. (Mavis), took not a particle of comfort when an order was entered in a federal district court awarding title to various artifacts retrieved from a sunken ship to a rival, Marshallton, Inc. (Marshallton). Mavis appeals. We affirm.

## I. THE BRINY DEEP

On August 12, 1982, after a period of substantial undersea exploration, Mavis discovered the resting place of the *S.S. Republic*, a White Star ocean liner which plummeted to a watery grave in 1909. The wreck was found three hundred feet (more or less) under the surface, some sixty miles south of Nantucket Island, encroaching upon a so-called Traffic Separation Scheme (TSS)—a delineated international shipping route. On December 7, 1982, Mavis commenced an action *in rem* before the United States District Court for the District of Massachusetts seeking, *inter alia*, salvage rights and title to the sunken vessel and its contents. In mid–1983, the district court allowed petitioner to proceed with salvage operations.[1]

There followed a series of skirmishes in the district court, not involving Marshallton and not now material. In the interim, Mavis's recovery efforts were characterized by considerable backing and filling. We need not recite chapter and verse; it suffices to say that the petitioner accomplished little of note. The ship remained unsalvaged until 1986.[2] Early that year, Marshallton moved to intervene. It claimed that Mavis had been too laggardly in salving the vessel, denigrated the petitioner's decision to postpone any further reclamation effort until July 1986, and sought permission to conduct a cargo recovery expedition of its own. On April 16, the district court found that Mavis had been dilatory and allowed intervention. This finding is well documented in the record and has not been challenged on appeal. And it is hornbook law that a would-be salvor, upon discovery of a wreck, does not automatically acquire rights to it in perpetuity. *See* 3A M. Norris, *Benedict on Admiralty: The Law of Salvage*, § 152 (7th ed. 1983). The salvor must remain "ready, willing and able to complete the salvage project". *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560, 567 (5th Cir. 1981) (*Treasure Salvors III*). To maintain its franchise to the exclusion of others, the salvor's efforts must be (1) undertaken with due diligence, (2) ongoing, and (3) clothed with some prospect of success. *See*

---

1. We express no opinion anent the district court's jurisdiction over a *res* which lay beneath international waters. For purposes of this appeal, it is plain that the district court had *in personam* jurisdiction over the present contestants, Mavis having initiated the proceeding and Marshallton having elected to intervene.

2. From this point forward, all dates mentioned in this rescript are in 1986 unless some other year is explicitly indicated.

*Cobb Coin Co. v. Unidentified, Wrecked & Abandoned Sailing Vessel,* 525 F.Supp. 186, 204 (S.D.Fla.1981); *Hener v. United States,* 525 F.Supp. 350, 359 (S.D.N.Y. 1981). It seems plain that petitioner did not meet this standard.

After ruling that Mavis had dropped the ball, the district court found Marshallton (the present appellee) to be, in effect, ready, willing, and able to proceed immediately with salvage. It gave appellee until June 30 to mount a recovery expedition—to get to the bottom of things, as it were. The court's grant of permission was conditioned upon Marshallton's compliance "with any applicable law and regulations," and upon its pledge to halt operations and vacate the site by the June 30 deadline. All items retrieved by the intervenor were to be safely preserved pending further order and petitioner was allowed to renew recovery efforts once Marshallton had departed. (In this regard, it should be noted that, even before Marshallton put its oar in the water, Mavis had planned to resume its labors no earlier than July 1.)

After trying unsuccessfully for a time to secure the imprimatur of the U.S. Coast Guard for its anticipated efforts (*see infra* n. 9), Marshallton finally gained to windward of its problems. The intervenor commissioned the *Twin Drill,* a ship of Panamanian registry, and sent it to the locus of the wreck. The vessel anchored in an outbound lane of the Off New York TSS. Salvage operations began on June 1. On June 10, Mavis moved to enjoin Marshallton from working on the site because, by anchoring the *Twin Drill* in a TSS, Marshallton was—as the movant saw it—out of compliance with applicable law (and thus, athwart the April 16 order). A hearing was held in the district court and the matter was taken under advisement. No restraint was imposed. Marshallton went about its business and the *Twin Drill* remained in place. It hauled anchor on June 30, in pursuance of the court's April 16 order.

On September 5, Marshallton moved for an award of title to the property recovered during its expedition and for exclusive salvage rights anent future operations at the site. The district court properly assumed *in rem* jurisdiction over the artifacts, Marshallton having brought them into Massachusetts. *See Platoro Ltd., Inc. v. Unidentified Remains of a Vessel,* 508 F.2d 1113, 1115 (5th Cir.1975). By memorandum and order dated February 23, 1987, the district court granted Marshallton title to all of the property which it had recovered, but declined to assign it exclusive salvage rights. The court likewise refused to enjoin Mavis—which, despite its assurances to the court, had failed to mount any semblance of a salvage party after the *Twin Drill* unmoored in late June—from undertaking a future expedition. In that decision, the district court specifically rejected Mavis's argument that Marshallton should forfeit the harvested fruits of its endeavors because its sortie was in knowing breach of the Convention on the International Regulations for Preventing Collisions at Sea, Oct. 20, 1972, 28 U.S.T. 3459, T.I.A.S. No. 8587 (entered in force on July 15, 1977) (COLREGS), and hence, violative of the court's April 16 order. The court found, in effect, that Marshallton's posture vis-a-vis the COLREGS was inconsequential; and that, in any event, its salvage operation was not unlawful within the meaning and intendment of the order. At the bottom line, the court discerned no equitable reason to keep from the intervenor the prizes, such as they were,[3] which had accrued in consequence of its search. Petitioner appeals that portion of the February 23, 1987 order which awarded Marshallton title to the bibelots it had extracted from the briny deep.

## II. A FISH OUT OF WATER?

■ We turn first to the question of appellate jurisdiction. Because the under-

---

**3.** To this point, the game may well have been worth appreciably less than the candle. Rather than retrieving the rumored cache of American gold eagles which, gossip had it, were aboard the *Republic* as part of a loan from France to the Czar, Marshallton found a motley assortment of waterlogged commercial cargo and bric-a-brac, *e.g.,* a set of monogrammed coffeepots and half a bedpan.

lying action remains pending in the district court and future salvage rights remain up for grabs, the order awarding the artifacts to Marshallton is not a "final decision[ ]" in the sense required by 28 U.S.C. § 1291. *See Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945) ("A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."). Thus, unless some other statute or rule confers jurisdiction, the appeal is not properly before us.

Although the waters are murky in this area of the law, we believe that 28 U.S.C. § 1292(a)(3) has pertinence to the issue. That section provides as follows:

(a) ... the courts of appeals shall have jurisdiction of appeals from:

\* \* \* \* \* \*

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

28 U.S.C. § 1292(a)(3).

The statute has deep and venerable roots. It was enacted in response to the penchant of admiralty courts to bifurcate the trial of certain maritime matters. Liability would first be adjudicated. If a party were found liable, the case would then be shipped to a commissioner or master to fix damages. As Professor Moore has put it:

The purpose of § 1292(a)(3) was to permit a party found liable to take an immediate appeal from that [liability phase] finding and thereby possibly avoid an oftentimes costly and protracted trial of the damage issues.

9 J. Moore, *Moore's Federal Practice,* ¶ 110.19[3] at 210 (1985). *See generally St. Louis Shipbuilding & Steel Co. v. Petroleum Barge Co.,* 249 F.2d 905, 907 (8th Cir. 1957).

Over time, the scope and purport of § 1292(a)(3) have been altered gradually; yet, the resultant mutation has been relatively little discussed. It is generally recognized that the statute represents a departure from the usual juridical policies barring most intermediate appeals, and thus, should be "somewhat narrowly construed." *In Re Northern Transatlantic Carriers Corp.,* 423 F.2d 139, 141 (1st Cir. 1970). Further, we agree with Professor Moore that § 1292(a)(3) was unaffected by the unification of civil and admiralty practice, and that it applies to:

(1) claims that are cognizable only in admiralty; [and] (2) claims that are within the admiralty and maritime jurisdiction but are also within the jurisdiction of the district court on some other ground, if such claims are identified as admiralty or maritime claims by the statement authorized by Rule 9(h) of the Federal Rules of Civil Procedure.

9 J. Moore, *supra,* ¶ 110.19[3] at 209. In harmony with this formulation, the referenced rule provides in pertinent part that:

A pleading or count setting forth a claim for relief within the admiralty and maritime jurisdiction that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim ... If the claim is cognizable only in admiralty, it is an admiralty or maritime claim ... whether so identified or not ... The reference in Title 28, U.S.C. § 1292(a)(3), to admiralty cases shall be construed to mean admiralty and maritime claims within the meaning of this subdivision (h).

Fed.R.Civ.P. 9(h).

Thus, we come full circle. Once the district court's admiralty jurisdiction has been established, § 1292(a)(3) takes hold if it can be demonstrated that an order which an aggrieved party seeks to appeal (1) is interlocutory, and (2) finally determines the rights and liabilities of the parties as to the particular issue. *Accord Maine National Bank v. F/V Explorer,* 833 F.2d 375, 377 (1st Cir.1987). By this we mean that the ruling must be on the merits; it must determine *substantive* rights, as opposed to merely procedural, tactical, or adjectival entitlements. *Accord Miskiewicz v. Goodman,* 341 F.2d 828, 830–31 (4th Cir.1965); *Rogers v. Alaska S.S. Co.,* 249 F.2d 646, 649 (9th Cir.1957). *See Jarka Corp. v. Rederii,*

110 F.2d 234, 235 (1st Cir.1940) (per curiam) ("Appeals lie, not from all interlocutory decrees in admiralty, but only from such ... as determine 'the rights and liabilities of the parties.'") (citation omitted). It remains, then, only to apply that formulation to the instant appeal.

■ The distinctively salty flavor of this litigation leaves little room to doubt that its provenance is nautical. There is solid precedential support for that proposition because the case involves, principally, a claim of salvage rights. *See Andrews v. Wall,* 44 U.S. (3 How.) 568, 572–73, 11 L.Ed. 729 (1845) (admiralty jurisdiction attaches to claims for salvage services as to cases involving, say, bottomry bonds); *Treasure Salvors III,* 640 F.2d at 566 (claims arising out of salvage operations—such as efforts to recover cargo from ships abandoned at sea—are within maritime jurisdiction); *Sobonis v. Steam Tanker National Defender,* 298 F.Supp. 631, 635 (S.D.N.Y.1969) (similar); *The Bee,* 3 F.Cas. 41 (D.Me.1836) (No. 1,219) (similar). Without any question, the case as filed was one which invoked the district court's "admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1).

■ The next yaw is as easily managed. The February 23, 1987 order was plainly interlocutory because the underlying action had not definitively been resolved. The competing claims of the would-be salvors to explore the wreck in the future were left undecided. So, we tack into the last leg of the passage, which requires us to ascertain whether, for purposes of § 1292(a)(3), the substantive rights and liabilities of these adversaries were sufficiently determined by the order. To be sure, the disputed decree did not fully resolve the claims of all parties to the case, or even the claims of these competing parties regarding their ultimate salvage entitlements. But, it did conclusively determine the rights of the only two claimants who asserted any interest in the specific artifacts recovered in June 1986. That, we think, was enough.

For an interlocutory order to be appealable under 28 U.S.C. § 1292(a)(3), it need not address all of the rights and liabilities at issue in the litigation. *Kingstate Oil v. M/V Green Star,* 815 F.2d 918, 921 (3d Cir.1987); *Bankers Trust Co. v. Bethlehem Steel Corp.,* 761 F.2d 943, 945 n. 1 (3d Cir.1985); *O'Donnell v. Latham,* 525 F.2d 650, 652 (5th Cir.1976). It suffices that the order conclusively lashes down the merits of some particular claim or defense. *Kingstate Oil,* 815 F.2d at 921; *Gulf Towing Co. v. Steam Tanker, Amoco New York,* 648 F.2d 242, 244 (5th Cir.1981); *Hellenic Lines Ltd. v. Brown & Williamson Tobacco Corp.,* 277 F.2d 9, 15 (4th Cir.), *cert. denied,* 364 U.S. 879, 81 S.Ct. 168, 5 L.Ed.2d 102 (1960); *cf. The SS Tropic Breeze,* 456 F.2d 137, 139 (1st Cir.1972) (§ 1292(a)(3) "applies to any decree finally determining the liability of one of the parties," though other issues may be left unresolved).

Unlike, say, cases in which exceptions to a libel in admiralty are overruled—the effect of which is merely to leave the libel standing for plenary trial on the merits—[4] the February 23, 1987 order definitively determined the rights and obligations of the only interested parties on a discrete and separable dispute within the larger case. Under that order, Marshallton was awarded title to the artifacts recovered by it and given leave to dispose of the same without liability to account in the future. We are satisfied that such a ruling falls within the accepted boundaries of the statute. Though 28 U.S.C. § 1292(a)(3) must be construed somewhat parsimoniously to guard against broadly piecemeal review— the statute surely does not permit appeal from all intermediate orders in admiralty— its embrace, we think, is sufficient to envelop this proceeding. We conclude, therefore, that this appeal, albeit interlocutory, is not a fish out of water. We have jurisdiction to hear and determine it.

## III. TAKING THE PLUNGE

■ As we plunge into the merits of the appeal, we must first acknowledge that

---

**4.** *See, e.g., Eagle of Gloucester, Inc. v. Consolidated Fisheries, Inc.,* 268 F.2d 555, 555–56 (1st Cir.1959) (per curiam); *Jarka Corp.,* 110 F.2d at 235.

there is a generic question as to when the law of finds—the ancient and honorable principle of "finders, keepers"—applies to property retrieved from the ocean floor, and when the law of salvage pertains. Yet, in cases where (1) articles have been presumptively abandoned, *i.e.*, either affirmatively renounced, or so long lost that time can be presumed to have eroded any realistic claim of original title, and (2) those articles are now in hand, having been actually recovered, the better-reasoned authorities agree that the law of finds may appropriately be utilized. *E.g., Klein v. Unidentified Wrecked and Abandoned Sailing Vessel,* 758 F.2d 1511, 1514 (11th Cir.1985); *Treasure Salvors III,* 640 F.2d at 567; *Chance v. Certain Artifacts Found and Salvaged from the Nashville,* 606 F.Supp. 801, 804 (S.D.Ga.1984), *aff'd mem.,* 775 F.2d 302 (11th Cir.1985); *Wiggins v. 1100 Tons, More or Less, of Italian Marble,* 186 F.Supp. 452, 456 (E.D.Va.1960). Without question, the *Republic* and its cargo had been long forsaken when discovered by Mavis and thereafter called to Marshallton's attention. After petitioner brought its action *in rem* in the district court, no person or firm appeared to assert any overall claim of ownership. And the intervenor had found the property and transported it to the court for the purpose of establishing its title. In such circumstances, given the passage of so many decades after the sinking, we think the district court did not err in deciding to apply the law of finds.

■ Nor can the district court be faulted for its further determination that Marshallton—the first finder lawfully to appropriate the abandoned artifacts, take dominion over them, and return them to land with the aim of acquiring ownership rights—had the prime claim to the articles. *See Treasure Salvors III,* 640 F.2d at 571; *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330,

337 & nn. 11–12 (5th Cir.1978) (*Treasure Salvors I*); *Chance,* 606 F.Supp. at 804; *Rickard v. Pringle,* 293 F.Supp. 981, 984 (E.D.N.Y.1968); *cf. Klein,* 758 F.2d at 1514 (recognizing principle, but discussing exception where wreck embedded in soil owned by third party). *See also* 3A M. Norris, *Benedict on Admiralty: The Law of Salvage,* § 158 at 11–14 (7th ed. 1983). But, possession alone is not enough; if it were, buccaneering would again flourish on the high seas. The finder must have gained possession of the "treasure" fairly and by lawful means.

Although Mavis has structured its appellate brief to take four swipes at appellee's claim of title, we believe that these expostulations overlap considerably. Thus, we boil the petitioner's arguments down to a pair, and address each in turn.

■ A. The COLREGS. Mavis has consistently charged that, because the *Twin Drill* anchored in a TSS while salvaging the wreck, the COLREGS were violated.[5] Accordingly, appellant protests that the intervenor came into possession of the artifacts only by breaking the law and, in the bargain, transgressing the conditions of the very decree which permitted it to conduct a salvage effort at all. (The district court's April 16 order, it will be recalled, allowed Marshallton to proceed only in compliance "with any applicable law and regulations".) Mavis views the entire recovery exercise as comprising nothing more than the spoiled fruits of an unlawful adventure. Because of this, petitioner's thesis runs, Marshallton, though the finder of the artifacts, had no right to retain them. The district court rejected this proposition. So do we.

The reefs which mar the petitioner's course are many and jagged. In the first place, as a matter of *federal* law, the COL-

---

**5.** The COLREGS consist of some thirty-eight rules which have been adopted worldwide by the maritime community. They were promulgated into law in this country pursuant to the International Navigational Rules Act, Pub.L. No. 95–75, 91 Stat. 308 (1977) (codified at 33 U.S.C. § 1601 *et seq.*) (Act). *See also* 33 C.F.R. pt. 81, app. A. at 184. Rule 1(d) of the COLREGS provides that TSSs may be adopted by the International Maritime Organization (IMO). It is uncontroverted that the IMO duly delineated the Off New York TSS in that manner. And, Rule 10(g) of the COLREGS states that "[a] vessel shall so far as practicable avoid anchoring in a traffic separation scheme or in areas near its terminations."

REGS had no bearing on this sortie. As the Act makes plain, the COLREGS, with certain limited exceptions not germane here:

> ... shall be applicable to, and shall be complied with by—
>> (1) all vessels, public and private, *subject to the jurisdiction of the United States*, while upon the high seas or in waters connected therewith navigable by seagoing vessels, and
>> (2) all other vessels when on waters subject to the jurisdiction of the United States.

33 U.S.C. § 1603 (1978) (emphasis supplied).

Although Mavis argues passionately that the *Twin Drill* was within the reach of the COLREGS, the facts and the law point unerringly to an opposite conclusion. Petitioner concedes that the *Republic* went down on the high seas, in waters not subject to the jurisdiction of the United States. The salvage vessel, The *Twin Drill*, was of Panamanian registry. This excluded her, while in international waters, from the sweep of 33 U.S.C. § 1603(1). The language of the statute—"vessels, public and private, subject to the jurisdiction of the United States"—is, we think, perfectly clear. It necessarily refers to ships of American registry.[6] And, such a reading of the law comports with the established tenet that "a vessel on the high seas is under the exclusive jurisdiction of the nation under whose flag she sails." *United States v. Green*, 671 F.2d 46, 49 (1st Cir.) (footnote omitted), *cert. denied*, 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982). *See also Lauritzen v. Larsen*, 345 U.S. 571, 585, 73 S.Ct. 921, 929, 97 L.Ed. 1254 (1953); United Nations Convention on the Law of the Sea, Dec. 10, 1982, art. 92(1), 21 I.L.M. 1261 (1982); 1958 Convention on the High Seas, *opened for signature* April 29, 1958, art. 6(1), 13 U.S.T. 2312, T.I.A.S. No. 5200, 450 U.N.T.S. 82 (entered into force Sept. 30, 1962) ("Ships shall sail under the flag of one State only and ... shall be subject to its exclusive jurisdiction on the high seas.").

Once it is recognized that the COLREGS, as a matter of federal law, had no pertinence to the actions of the *Twin Drill*, then the linchpin of Mavis's entire argument crumples. Panama—the flag state—was notified of the anticipated incursion into the TSS in May 1986, and expressed no concern. The appropriate Panamanian agency—the Directorate of Consular and Maritime Affairs (DCMA)—noted the elaborate steps which Marshallton had taken to alert seafarers and other affected parties to the temporary obstruction of the TSS. Given these efforts, and what it perceived as the worthy purpose of the mission, DCMA expressed the belief that the "grounds" were "sufficiently valid" to warrant permitting the vessel to drop anchor as planned, TSS or no. Thus, the *Twin Drill*—and derivatively, Marshallton—was in full compliance with United States law and with foreign (Panamanian) law.[7]

■ Nothing further is required on this point. The same district judge who imposed the compliance-with-applicable-law condition heard the evidence and concluded that mooring the *Twin Drill* in a TSS was, the COLREGS notwithstanding, insufficient reason to keep Marshallton from securing title. We have noted before the special role played by the writing judge in elucidating the meaning and intendment of

6. To the extent that any doubt may obtain—and we, at least, have none on this point—the legislative history of the Act makes it abundantly plain that, in international waters, the COLREGS affect only vessels of U.S. registry. *See, e.g.,* H.R.Rep. No. 95–447, 95th Cong., 1st Sess., 1 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin.News 509 (regulations are "applicable to all U.S. vessels while operating on the high seas"); *id.* at 43, 1977 U.S.Code Cong. & Admin. News at 522 ("the proclaimed International Regulations [COLREGS] shall be complied with by all United States vessels, public and private, while those vessels are operating upon the high seas").

7. Mavis, trying harder, asks that we strip away the "facade of foreign registration" in order to apply the COLREGS. This exhortation must be addressed to Congress rather than the courts. Notwithstanding that a domestic firm may benefit from a ship's work, the language of the Act neither requires nor allows us to extend the regulations to foreign flag vessels in international waters. *See, e.g.,* 33 U.S.C. §§ 1603, 1604.

an order which he authored. *See Lefkowitz v. Fair,* 816 F.2d 17, 22 (1st Cir.1987); *Advance Financial Corp. v. Isla Rica Sales, Inc.,* 747 F.2d 21, 26 & n. 10 (1st Cir.1984). Under the unique circumstances of this case, there is no reason to believe that the district court abused its discretion in declining to impose a forfeiture on the intervenor.[8]

■ B. *Good Faith.* Mavis contends that, when a salvor comes before an admiralty court seeking to keep booty it has found, the tribunal must examine into the salvor's conduct. The good faith, candor, and probity of the salvor, or the lack of those qualities, petitioner asserts, should influence judicial oversight. *See, e.g., Hener,* 525 F.Supp. at 358 (misconduct "jeopardizes [one's] status as salvor and the recovery to which he would otherwise be entitled"); *Rickard,* 293 F.Supp. at 984–85 (similar). Inasmuch as maritime law, in Mavis's view, requires the "most scrupulous" behavior on the part of salvors, *The Barque Island City,* 66 U.S. (1 Black) 121, 130, 17 L.Ed. 70 (1861), Marshallton—which petitioner believes conducted itself poorly— failed to meet this nonpareil standard and should not be "rewarded" by title to the artifacts.

Insofar as this argument rests on the intervenor's actions with respect to the COLREGS, it has no merit. Because the Coast Guard had no jurisdiction over either the *Twin Drill* or the site, *see supra* Part III–A, Marshallton cannot be faulted for proceeding without some sort of (ultimately meaningless) permission from that agency.[9] And, the suggestion that the intervenor should be taken to task for endangerment of international maritime traffic is simply unproven. Whatever *theoretical* hazard may have been presented by anchoring in a TSS, there was no evidence that any person or property was *actually* placed in jeopardy.

■ Insofar as Mavis casts its net to catch a broader array of equities—suggesting, for example, that the court gave too little weight to its contribution to the find —the asseveration is untimely. At the district court hearing on Marshallton's motion to secure title to the artifacts, Mavis relied entirely on the ostensible breach of the COLREGS to justify its opposition. No mention was made of a superior entitlement supposedly inuring to petitioner because of its role in the discovery. The argosy is now too far along to surface new matters. "In the absence of extraordinary circumstances, ... we have regularly declined to consider points which were not seasonably advanced below." *Clauson v. Smith,* 823 F.2d 660, 666 (1st Cir.1987) (collecting representative First Circuit caselaw). Having sailed into—and out of—the district court under the (now shredded) banner of the COLREGS, "it is too late in the day for [petitioner] to put into an appellate port flying fresh, untested colors." *Id.*

## IV. SHIPSHAPE AND BRISTOL FASHION

There is no need to churn the waters further. We have jurisdiction to determine the interlocutory appeal in this maritime matter. *See* 28 U.S.C. § 1292(a)(3). Yet upon close examination, the assignments of error sink of their own weight. The district judge handled the motion for confirmation of title in a manner that was shipshape and Bristol fashion. The court did not err in awarding to Marshallton the

---

8. Indeed, even if the COLREGS were applicable and an *admitted* violation of them had taken place, forfeiture would not necessarily have resulted. The Act, *see* 33 U.S.C. § 1608 (1982), provides for the administrative imposition of civil fines to penalize infractions of the COLREGS. We doubt that a court, faced with such a violation, would be compelled *as a matter of law* to strip a salvor, otherwise entitled, of the legitimate fruits of its operose toil.

9. In fact, Marshallton tried in vain to get advance approval of its plan from the Coast Guard. That this blessing was initially pursued likely demonstrates good faith rather than the obverse, notwithstanding that such approval was never received. When that failed, Marshallton sought—again, without success—to get some binding declaration that the Coast Guard had no power to call the shot. It was not until the Coast Guard (1) declined an invitation to intervene in the district court proceedings and (2) conceded that it lacked jurisdiction over the placement of the *Twin Drill* that Marshallton turned its attention elsewhere.

artifacts which it had brought home from the briny deep in the aftermath of its June 1986 salvage expedition.

*Affirmed.*